## JOHN V. FARWELL *vs.* JAMES BALE *et al.*

Submitted on briefs Nov. 2, 1891. Decided March 10, 1892.

**Evidence Examined**—The evidence in this action, which was brought to foreclose a real-estate mortgage, examined and considered. *Held,* to have been insufficient to support the findings of fact on which judgment was ordered for defendant mortgagor.

Appeal by plaintiff, John V. Farwell, from a judgment of the District Court of St. Louis County, *Ensign*, J., entered July 18, 1891.

John V. Farwell of Chicago, Ill., commenced this action in February, 1890, to foreclose a mortgage for $25,000 given him by defendant James Bale, July 12, 1888, upon a half interest in six hundred acres of land supposed to contain iron ore, and situated in Township sixty-one (61) north, Range fourteen (14) west, near Vermilion Lake, in St. Louis County, Minnesota. The mortgage, when given, was to secure $15,000 previously advanced, and $10,000 to be advanced. This money was used, and to be used, in exploring and making excavations on another tract of land lying near Burnside Lake, some six miles northeast of the land mortgaged, and for which Mr. Bale held a lease. A note for the amount accompanied the mortgage, and a collateral contract was executed between the parties supplementary to a former contract dated June 28, 1887, providing for the formation of a corporation, and the assignment to it of the lease of the land near Burnside Lake, and the sale of the capital stock in case ore was found in quantity and grade to warrant it, in which case the advances so made by plaintiff were to be repaid him from sales of this stock, and the mortgage discharged. After he had advanced in all $18,000, plaintiff refused to advance more. Ore had not been discovered in paying quantities on the tract at Burnside Lake, and it was found that the tract at Vermilion Lake was inadequate security for the $18,000 already advanced. The other defendants in this action were subsequent incumbrancers.

Defendant Bale answered, contending that, by the failure of Mr. Farwell to advance the remaining $7,000, defendant had been prevented from continuing explorations and excavations on the Burnside Lake tract, and from discovering ore there, and for that reason the whole scheme had collapsed, and he had sustained great damage, and he prayed that the mortgage be canceled.

The issues were tried October 2, 1890.. The Judge made findings April 4,'1891, and directed judgment to be entered for defendants canceling the note and mortgage. Judgment was entered accordingly, and plaintiff appealed. The matters discussed in this court were principally questions of fact, whether the evidence sustained the findings.

*Walter Ayers,* for appellant.

*Wm. B. Phelps,* for respondents.

COLLINS, J. This was an action brought to foreclose a mortgage upon real property. Plaintiff mortgagee was a merchant in Chicago, while defendant mortgagor was a mining expert or explorer residing in Duluth. On June 28, 1887, they entered into a contract in writing in respect to the formation of a mining corporation by plaintiff, of which defendant was to be the manager, and the owner of three eighths of the capital stock; plaintiff to hold the balance. A lease of certain mining property then held by defendant was to be assigned to the corporation as soon as organized, and defendant expressly guarantied to plaintiff in this contract, and was also to make the same guaranty to the corporation, when formed, that the ore taken from the leased premises would be of a certain per cent. metallic iron, and marketable as Bessemer ore. Plaintiff agreed to pay to defendant the sum of $10,000 in cash, and the further sum of $15,000 from the first stock sold. He further guarantied that the corporation should be completely organized within six months. It was also stipulated between the parties that, if the ore taken from the mine should not be of the per cent. mentioned, or should not be marketable as Bessemer, or if the provisions of the contract should not be carried out for any reason, then the amount paid defendant by plaintiff—$10,000—should be considered a loan to defendant,

payable on demand, with interest at 6 per cent. There were other provisions, of no particular consequence here. The plaintiff actually paid over to defendant the sum of $15,000, a part of which was used by the latter in attempting to develop a mine on the leased premises, the lease thereof having been assigned to plaintiff. There were no such results as would have warranted a sale of stock shares in the corporation which was formed, and hence none were sold; the plaintiff advancing $5,000 of his own funds of the $15,000 which he was to obtain and furnish by a sale of stock. It seems to be conceded by all that, if there is iron ore in paying quantities on the leased property, it has not yet been discovered.

The enterprise drifted along until July 12, 1888, when the parties entered into another written contract, in which it was recited that for divers reasons the first, of date June 28, 1887, had not been fulfilled by either party in all respects, and changes therein were mutually desired. It was agreed that the new contract should be supplemental, and, in so far as it was inconsistent, in lieu of the old. Bale was to give his note to Farwell, of that date, for the sum of $25,000, payable in six months, with interest, and to secure the payment of the same with a mortgage upon an undivided half interest which he held in certain real property in this state. It was also agreed that, should Farwell deem this mortgage insufficient security for the amount of the note, then Bale, upon being notified of the fact, should furnish other and additional security, so that the sum of $25,000 would be amply and sufficiently secured to Farwell. There was a further agreement that the note before mentioned covered and represented the $15,000 already advanced by Farwell, and also covered the sum of $10,000, thereafter to be advanced by him, of which $3,000 was then and there paid over for a special purpose hereinafter referred to. The balance—$7,000—was to be drawn by Bale from time to time, as might be necessary, for developing the mining property. If within six months from date there was sufficient ore in place, of the quality mentioned in the first contract, to reimburse Farwell for the amount of money he had so invested, (providing his five-eighths interest in the mine should be salable on the market for that amount,) then he was to discharge the mortgage,

and surrender the note to Bale, retaining in lieu of the same the five-eighths interest in the property. There was a further stipulation in this second contract, of prime importance in this proceeding, to the effect that, if a mine was not discovered within six months from date, of the character mentioned, or in the event of Farwell's interest not being salable on the market for a sum sufficient to reimburse him for the money advanced, or in case the terms of the contract were not fulfilled, "or any other reason," Farwell might, at his option, consider the amount represented by the note as a loan to Bale, and proceed to collect it, and enforce the mortgage in the usual manner. This mortgage was executed simultaneously with the contract, was duly recorded, and is that which plaintiff, as mortgagee, is attempting to foreclose in this action.

It is in evidence that, subsequent to its execution, Farwell refused to pay certain bills which were forwarded to him for payment by Bale, but from the record it cannot be told just when, or in what amounts, payment of the $7,000 was demanded. No part of it was paid over, however, so that the amount claimed to be due on the note is $18,000, with interest; and it stands confessed that this sum was advanced and paid over to the mortgagor, Bale, by the mortgagee, Farwell.

Reference has been made to the sum of $3,000 paid to Bale at the time of the execution of the second contract, and for a special purpose. There was no dispute between the parties as to this special purpose. Bale wished to buy at that time a Diamond drill, with operating machinery, for use at the mine; the price thereof being $3,000. Farwell advanced this sum for the express purpose of paying for the drill and machinery. Bale bought the same, but paid no part of the $3,000 thereon. His testimony on this point is that he afterwards used this money in the payment of men employed in developing the mine, and for necessary provisions and other articles. Who paid for the drill, or whether paid for by any one, does not appear. The drill and machinery were taken to the property, put in operation, and run until about December 1, 1888. No work was done thereafter, and no one disputes the plaintiff's claim that there was an utter failure of the mining scheme. The worthlessness of the

property for iron ore seems to have been demonstrated to a certainty, except as a matter of opinion with defendant and other so-called "mining experts."

It seems that plaintiff caused an examination to be made of the mortgaged property soon after the execution of the mortgage, and about August 24th directed his attorney at Duluth, Minn., to notify defendant that the security was inadequate, and additional security must be furnished by him. This notification was made August 31st, and defendant then furnished to plaintiff's attorney a description of land, which he proposed as additional security, and the names of two or three persons who were capable of making a proper investigation for the purpose of reporting upon its value, which concededly was largely problematical, dependent on the ore prospects. One of these persons was the witness Sellwood, and it was agreed that the attorney should procure his services for this purpose. Sellwood could not go at once, and of this defendant was informed. He does not seem to have interested himself in procuring an early examination, nor to have suggested any other method by which plaintiff could be satisfied as to the real value of his proposed security. There was considerable delay, solely because Sellwood could not get away from prior engagements; but the report was made by him, and by another person, who had been mentioned by defendant as a competent examiner, to the attorney, on October 23d. This report was very unfavorable. The land had no real value, and, of course, could not be accepted as additional security. The examiners reported, and upon the trial testified, that it might have a value, but that it was purely speculative, and for mining purposes only. Bale was advised of this report, and that the security offered was unsatisfactory. On December 6, 1888, he positively refused to give any other security for the debt, and there seem to have been no further steps taken by either party until this action was commenced, about one year later.

It is apparent from the testimony that the mortgaged land is very inadequate security for the amount of money already advanced, unless iron ore, valuable for mining, should be found upon it. As this seems quite improbable, it is evident that plaintiff's refusal to accept and remain satisfied with it as security for the amount of the

note was not captious, or without foundation. The refusal was amply justified, and was provided for by the contract of the parties.

The answer set forth several defenses; but upon the trial, although both parties wandered greatly from the real issues, defendant appears to have settled down upon a claim that by reason of plaintiff's unnecessary and unreasonable delay and neglect to make an investigation of the quality and character of the real estate proposed as additional security, Bale was deprived of money, and therefore could not make such exploration as was essential for the discovery and development of an iron mine. In other words, that he was prevented from complying with the terms and conditions of his part of the contract by the refusal of the plaintiff to comply with terms and conditions precedent, imposed upon him by the same contract. The trial court found that from the day Bale furnished plaintiff's attorney with a description of the land which he proposed as additional security he urged an examination of the same, and that the examination, report, and notification of the result were unnecessarily and unreasonably delayed, to his prejudice; that plaintiff was well aware of the fact that without prompt payment of the balance due Bale would be unable to carry out his undertaking; that the latter acted in good faith, and in all things complied with the terms of his contract, until further performance on his part was rendered impossible by reason of plaintiff's default. Also that he furnished money of his own to carry on the work, after this default, to the amount of about $3,000. There were findings on which plaintiff would have been entitled to judgment as demanded in the complaint, except for the foregoing; and also findings in respect to the assignment of the lease by defendant to plaintiff; that the latter had not reassigned it, and had not transferred to Bale any of the shares of stock of the mining corporation. We are unable to see what these findings as to the reassignment of the lease or the transfer of stock shares have to do with a foreclosure of plaintiff's mortgage. His rights are based on the contracts, and in neither were these matters referred to. Judgment for defendant was ordered by the court on its findings of fact. It was duly entered, and plaintiff appeals therefrom.

Error as to the sufficiency of the evidence to sustain some of the

findings, and error in the conclusions of law, are assigned by appellant. The judgment must be reversed, and a new trial ordered.

The contracts known as Exhibits A and B, as well as the mortgage, are to be construed together, although by express agreement the second contract superseded the first wherein they were inconsistent. By the terms of the second, it is apparent that the mortgagee was empowered to demand other and additional security, should he deem the mortgaged land insufficient for the sum of $25,-000. The mortgagor covenanted, on being notified that the mortgagee regarded his security as inadequate, that he would furnish other and additional, so that repayment of the proposed conditional debt should be amply and sufficiently secured. The mortgagee's right to insist upon a compliance with the terms of this condition cannot be questioned, and that he has not done so without good cause is equally as clear. It is true that the character of the additional security was not specified, but when it was demanded defendant promptly furnished a description of certain real property which he proposed to mortgage, and thus there appears to have been no difference of opinion as to what kind of security was intended. Defendant also suggested the names of certain persons, who, in his judgment, were competent to examine the land, and report upon its value to plaintiff. The parties, by their acts, have practically construed this feature of their contract. Again, when further security was demanded, and later, when defendant was notified of the nature of the report made by the examiners, he did not base a refusal to furnish other security on the ground that plaintiff had failed or declined to pay over the balance of the money. He apparently acquiesced in plaintiff's right to then make the demand, and again we find that the parties have put a practical construction on their contracts. It is evident also that this was a proper construction, because the right to demand further and other security could be exercised whenever the plaintiff deemed that which he had inadequate, and it was Bale's duty to furnish it on being notified. These were wholly independent conditions, and had no relation to the paying over of the remainder of the money, for that was be to drawn from time to time, only as it might be needed. It does appear that

nearly one third of this remainder was at once paid, for a special and well-understood purpose, to Bale, and on his representation that he needed it for such purpose, and that Bale deliberately diverted it to another purpose, which, although legitimate enough in the way of carrying on the work, was contrary to an understanding between the parties, arrived at after the execution of the contracts, and which in good faith should have been carried out. Bale's disregard of this part of the transaction might well cause the plaintiff to be more cautious and exacting in respect to the security, and it might have justified a refusal to proceed further; for, although it appears that plaintiff knew that Bale had not appropriated the $3,-000 in payment of the drill and machinery, as he agreed to, it does not appear that he was ever informed that the money was used legitimately, or that he ever knew what became of it after it passed into Bale's possession. As has been stated, Sellwood and another expert were employed to examine the land offered as security, at Bale's suggestion. There was a delay of about seven weeks in getting an examination, but Bale manifested little or no interest in the matter. He made no effort himself to get the examiners at work, had no views to offer which would have tended to expedite it, and seems to have carefully avoided the office of the attorney at Duluth, who had the subject of additional security in charge. Although the report was made in October, it stands undisputed that Bale was not informed of the result until December 5th, simply because he could not be found by the attorney. The land to be examined was many miles from Duluth, in a new and uninhabited region; and, under the circumstances, a delay of seven weeks ought not to have been wholly unexpected. Again, the delay was that of men who had been selected by defendant as much as by plaintiff, although in the employ of the latter. In any event, we fail to see how the delay, such as it was, affected the result. Defendant was at work with the drill, machinery, and men until long after the report was made, and up to the time that he was informed of plaintiff's determination to insist upon better security, and had failed to accomplish anything, although, if the testimony be true, he had used, of his own means, about the amount of money which

remained unpaid by plaintiff.   It is proper to assume that, had the examination and report been made earlier, it would have been equally as unfavorable; and it may also be assumed that, on being notified of the result, defendant would then have refused other security, as he did later on.   Apparently nothing would have been gained to him, with an earlier announcement that his proposed security was unsatisfactory.   His failure to find iron ore upon the leased premises cannot be attributed, as a matter of fact, to any delay or neglect of plaintiff to promptly determine whether he would accept the proposed additional security, and without reference to the question of law involved.   By the express terms of the contract, plaintiff was entitled to ample and adequate security for the sum of $25,000, and it was incumbent on defendant to furnish it.   It is obvious that the tracts of land mortgaged and that subsequently offered were not sufficient security for one third of that sum, except by attaching fictitious and speculative values based upon opinions and conjectures as to the presence of mineral.   Such was not the kind of security defendant voluntarily convenanted to furnish, and he cannot be permitted to rely upon a breach of his own covenant to deprive plaintiff of his right to collect his debt by enforcement of the mortgage or otherwise.   We have not specially referred to the clause in the second contract concerning the plaintiff's option under certain contingencies.   It is unnecessary to consider it further.

Judgment reversed.

(Opinion published 51 N. W. Rep. 621.)